STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

NICHOLAS M. PARKER (CABN 297860)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7368
    Fax: (415) 436-7234
    Nicholas.Parker3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MELVIN ALEXIS DIAZ ARTEAGA,<br><br>    Defendant. | CASE NO. 3:23-cr-00002 JSC<br><br>**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION**<br><br>Hearing Date:  January 10, 2023<br>Hearing Time:  10:00 a.m.<br>Courtroom:     14 (18th Floor)<br>Judge            Hon. Alex G. Tse |

### I.    INTRODUCTION

On November 21, 2022, the government filed a memorandum in support of its motion for detention. *See* Dkt. 5. As set forth in that memorandum—which the government incorporates herein by reference—the defendant was arrested on November 16, 2022, with more than 26 pounds of narcotics, including *more than 18 pounds of fentanyl*; two semi-automatic handguns and ammunition; more than $50,000 in cash, including almost $42,000 in shrink-wrapped cash found in his bedroom; and various indicia of drug trafficking, including scales, cutting agents, and a hydraulic press commonly used to prepare fentanyl for sale. The government submits this supplemental memorandum to raise a handful of additional points and to advise the Court why it continues to believe that detention of the defendant pending trial is warranted.

## II. ARGUMENT

### A. The Defendant Possessed a Staggering Quantity of Dangerous Drugs

This was no ordinary drug bust. According to the Drug Enforcement Administration ("DEA") and San Francisco Police Department ("SFPD"), the arrest of the defendant and concomitant searches in November resulted in the largest seizure of fentanyl by SFPD and the DEA Metro Task Force in all of 2022. Most seizures of this size in the Bay Area are of drugs being transported by drug trafficking organizations throughout the Western United States. By contrast, the drugs seized in connection with the arrest of the defendant were destined for sale in one location: the Tenderloin.

What is more, although most of the nearly 15 pounds of fentanyl seized from the defendant's stash house was already packaged for sale on the streets of San Francisco, some of it (approximately two pounds) was in a sealed black container—what the DEA calls a transport package or bladder that traffickers often use to bring fentanyl across the U.S.-Mexico border. When DEA agents cut the sealed package open, they found a densely packed white powder that immediately tested positive for fentanyl. Based on the DEA agents' training and experience (including their knowledge of transport packages, fentanyl trafficking, and drug purity), this substance was pure, unadulterated fentanyl—an extremely potent substance that could be sold on the street as-is, where it would be deadly in vanishingly small doses, or it could be broken down, diluted, and sold in a much larger quantity:



As explained in the government's prior filing, SFPD and DEA officers seized a total of approximately 26.4 pounds of narcotics in connection with the arrest of the defendant—18.4 pounds of fentanyl, 2.3 pounds of heroin, 2.1 pounds of powder cocaine, 1.4 pounds of crack cocaine, 2.0 pounds of oxycodone (approximately 7,500 pills), 47.4 grams of methamphetamine, and 15.7 grams of Xanax.[1] A low-end estimate pegs the street value of those drugs at about $350,000.[2] Possession of such a significant quantity of narcotics—not to mention $50,000 in cash—suggests that the defendant and his co-conspirator were significant figures in the San Francisco narcotics industry, not bit players. *See United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011) ("We have recognized that possession of a substantial amount of narcotics is grounds for refusing to grant a sentence reduction, even in amounts smaller than 1 kilogram. The court was justifiably skeptical that this amount of drugs would be entrusted to a minor player." (quotation and citation omitted)).

**B.     The Sheer Quantity of Drugs Exposes the Defendant to a Decade or More in Prison**

Since the parties first appeared before the Court, a federal grand jury has returned an eight-count indictment charging the defendant with six drug offenses, including two—charged in Counts One and Two—that carry a mandatory minimum sentence of 10 years in prison and a statutory maximum of life imprisonment upon conviction. *See* Dkt. 17; 21 U.S.C. § 841(a)(1) and (b)(1)(A). Moreover, even if the defendant is safety-valve eligible and therefore not subject to the 10-year mandatory minimum (a point the government takes no position on for purposes of this filing, especially considering the fact that officers found two semi-automatic handguns in the stash house), he nevertheless faces a sentence at or above the applicable mandatory minimum. The defendant may quibble about which drugs are attributable to him, but even if only the fentanyl found in the stash house in Berkeley is attributed to the

---

[1] These amounts do not even include the five ounces of fentanyl and five ounces of methamphetamine the defendant sold to an undercover SFPD officer ("UC") between September 16, 2022, and October 5, 2022, as described in the government's detention memo and, in part, in the Complaint on file in this case. *See* Dkt. 1 at ¶¶ 13–25; Dkt. 5 at 3. The defendant sold those drugs to the UC for a total of $3,700. *See* Dkt. 5 at 3. And he is charged with two of those sales in Counts Seven and Eight of the Indictment in this case. *See* Dkt. 17.

[2] This is a "low-end estimate" because it calculates the street value of these drugs on a per-ounce basis—except for the oxycodone, the price for which is calculated on a per-pill basis. When the defendant sold fentanyl and methamphetamine to the UC, he sold full ounces, but it is possible—indeed, probable given the higher margins associated with dealing in smaller quantities and the fact that officers repeatedly witnessed the defendant sell drugs on the street—that the defendant regularly sold these drugs in smaller units (*e.g.*, grams) for higher relative prices than those the government uses for purposes of this filing.

defendant, the government calculates that his base offense level is 34, *see* U.S.S.G. § 2D1.1(a)(5), (c)(3), which results in an advisory Guidelines range of **at least 97-121 months**, even accounting for acceptance of responsibility and safety-valve credit. In fact, the defendant's true exposure may be quite a bit higher (even if he pleads guilty) depending on the applicability of one or more enhancements and the defendant's safety-valve eligibility—potentially as high as **188-235 months** (if the defendant is not safety-valve eligible) or **151-188 months** (if he is). The defendant has ample incentive to avoid such a significant sentence by fleeing and failing to appear for future proceedings in this case; indeed, the potential length of his sentence "makes it more likely that he will flee." *United States v. Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991) (affirming district court decision detaining defendant pending trial where defendant faced lengthy period of incarceration); *see also United States v. Tierney*, No. 09-cr-68 VBF, 2010 WL 1929828, at *2 (C.D. Cal. May 10, 2010) (detaining defendant pending trial after finding that, "[i]f convicted, Defendant faces a significant sentence").

(As an aside, the defendant has implied that the government may struggle to prove that he possessed the drugs seized from the stash house in Berkeley. Not so. The government's evidence suggests the defendant was present at the stash house *every single day* between October 13 and November 11, 2022. What is more, SFPD and DEA officers physically observed him there at least four times between October 27 and November 9, 2022—and again, of course, when they arrested him there on November 16, 2022—and they saw him go inside the stash house at least twice in that same time frame. Moreover, the defendant is charged not just with substantive drug offenses, but also with conspiring to distribute and possess with intent to distribute fentanyl.)

**C.     There Is No Surety or Custodian to Ensure the Defendant's Presence in Court**

The defendant has offered his cousin as a potential "unofficial custodian." As the Court is aware, however, the defendant's cousin is unwilling to be an official surety or custodian, which of course means she faces no consequences whatsoever if the defendant fails to abide by the Court's orders. She also told Pretrial Services that she "has a very bad memory." Dkt. 8 at 2. That alone should disqualify her, but even if she *was* willing to be an official surety or custodian, she would not be a sufficient guarantor of the defendant's presence in court. That is so for several reasons.

*First*, the defendant *already lived* with his cousin at the time of his arrest (and at all times relevant to the Indictment), so his cousin was either complicit in his crimes, willfully blind to them, or completely ignorant of his criminal behavior—all of which cast substantial doubt on her ability to influence him, let alone to exert control over him and compel his attendance in court. Indeed, the government's investigation has revealed that the defendant traveled from his (and his cousin's) residence in Oakland to San Francisco to sell drugs *every single night* between October 13 and November 11, 2022. See Dkt. 5 at 4 n.1. Surely his cousin's suspicious were—or at least should have been—aroused by the defendant's repeated, prolonged absence from her home each night.

*Second*, the defendant has already conscripted one of his cousin's adult children, Kristhian Arteaga-Turcios, who lives at the same residence in Oakland, into his drug trafficking ring. Indeed, the defendant sent Mr. Arteaga-Turcios to sell fentanyl to the UC on September 24, 2022, as described in the Complaint. *See* Dkt. 1 at ¶¶ 22-25. Officers arrested Mr. Arteaga-Turcios for that offense when they searched the defendant's residence on November 16, 2022. Perhaps in light of the defendant's unstable living arrangement, Pretrial Services continues to recommend that he be detained pending trial. *See* Dkts. 6, 8.

*Third*, the defendant has extensive connections to Honduras. As reflected in Pretrial Services' reports, both of his parents reside in Honduras. *See* Dkts. 6, 8. Three of his four siblings live in Honduras; the fourth lives in Spain. *See id.* He has a child in Honduras. *See id.* He was deported or removed to Honduras in July 2012 and May 2017. *See id.* Ultimately, there is little to keep the defendant in the Bay Area to face the charges now pending against him.[3]

---

[3] The defendant has not shown any ability to abide by Court-ordered conditions of release in the past: for example, he violated a stay-away from the Tenderloin in April 2018 when he threatened a passerby with a knife after the passerby's companion dared to decline the defendant's offer to sell her narcotics.

### III. CONCLUSION

There is no set of conditions that will reasonably assure the appearance of the defendant at court proceedings or ensure the safety of the community. For the foregoing reasons, and for the reasons stated in the government's previously filed memorandum in support of its motion for detention (see Dkt. 5), the Court should order the defendant detained pending trial.

DATED: January 10, 2023

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

 /s/ Nicholas M. Parker
NICHOLAS M. PARKER
Assistant United States Attorney